Daniel C. Girard (State Bar No. 114826)
dcg@girardgibbs.com
Jonathan K. Levine (State Bar No. 220289)
jkl@girardgibbs.com
Aaron M. Sheanin (State Bar No. 214472)
ams@girardgibbs.com
Christina H. C. Sharp (State Bar No. 245869)
chc@girardgibbs.com
**GIRARD GIBBS LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone:  (415) 981-4800
Facsimile:   (415) 981-4846

Plaintiffs' Lead Counsel

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

LINDELL VAN DYKE, AS TRUSTEE FOR
THE VAN DYKE FAMILY TRUST, and
SANDRA OLSEN, Individually And On Behalf
of All Others Similarly Situated,

                Plaintiff,

                v.

WELLS FARGO & CO., WELLS FARGO
INVESTMENTS, LLC, WELLS FARGO
INSTITUTIONAL SECURITIES, LLC, WELLS
FARGO SERVICES, LLC, and WELLS
FARGO BANK, N.A.,

                Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CIVIL ACTION NO. 08-cv-1962 (JSW)**

**LEAD PLAINTIFFS' MEMORANDUM IN
OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

Date:    July 31, 2009
Time:   9:00 a.m.
Place:  Courtroom 11

Honorable Jeffrey S. White

## **TABLE OF CONTENTS**

SUMMARY OF ARGUMENT ..................................................................................................1

STATEMENT OF FACTS ....................................................................................................2

    A.    The Mechanics of ARS ...........................................................................2

    B.    Broker-Dealers Engaged In Widespread Manipulation Of The ARS Market. ..............3

    C.    Without Broker-Dealer Support, The ARS Market Immediately Collapsed................3

    D.    Wells Fargo Occupied Multiple Roles In The ARS Market........................................4

    E.    Wells Fargo Failed To Disclose Material Facts about ARS. .........................................4

    F.    State Securities Regulators Charge Wells Fargo With Fraud ........................................5

    G.    Plaintiffs' ARS Purchases ...........................................................................................5

ARGUMENT ....................................................................................................6

I.    PLAINTIFFS STATE CLAIMS UNDER SECTION 10(b). .........................................6

    A.    Legal Standard On A Motion To Dismiss ...................................................................6

    B.    Plaintiffs Allege Defendants' Misconduct With Requisite Specificity .......................6

        1.    Wells Fargo Institutional Securities And Wells Fargo Brokerage Services ......6

        2.    Wells Fargo Investments.....................................................................................7

        3.    Defendants' "Truth On The Market" Argument Rests On Erroneous
            Premises And Raises Disputed Factual Issues..................................................9

    C.    Plaintiffs Sufficiently Allege Scienter. ....................................................................12

        1.    Standard For Pleading Scienter.......................................................................12

        2.    The Allegations Here Give Rise To A Sufficient Inference Of Scienter.........13

        3.    Defendants' Piecemeal Criticisms Of The Scienter Allegations Lack Merit ..15

    D.    Plaintiffs Sufficiently Allege Reliance. ....................................................................16

        1.    Plaintiffs Are Entitled To A Presumption Of Reliance Under *Affiliated Ute*
            For The Class Claims....................................................................................16

2.      Plaintiffs Are Entitled To A Presumption Of Reliance For The Class
        Claims Under The Fraud-On-The-Market Theory ...........................................17

E.      Plaintiffs Adequately Allege Economic Loss And Loss Causation...........................18

II.     PLAINTIFFS STATE CLAIMS UNDER SECTION 20(a).....................................................20

CONCLUSION..............................................................................................................................20

# **TABLE OF AUTHORITIES**

**Cases**

*Affiliated Ute Citizens v. United States*
    406 U.S. 128 (1972) .................................................................................17

*Blackie v. Barrack*
    524 F.2d 891 (9th Cir. 1975) ...................................................................17

*Basic v. Levinson*
    485 U.S. 224 (1988) .................................................................................17

*Bell Atlantic Corp. v. Twombly*
    550 U.S. 544, S. Ct. 1955 (2007).............................................................6

*Binder v. Gillespie*
    184 F.3d 1059 (9th Cir. 1999) .................................................................17

*DeMarco v. Robertson Stephens Inc.*
    318 F. Supp. 2d 110 (S.D.N.Y. 2004)......................................................18

*Dura Pharmaceuticals, Inc. v. Broudo*
    544 U.S. 336 (2005) .................................................................................19

*Fecht v. Price Co.*
    70 F.3d 1078 (9th Cir. 1995) ...................................................................12

*Glazer Capital Management, LP v. Magistri*
    549 F.3d 736 (9thCir. 2008) ..............................................................15, 16

*Gompper v. VISX, Inc.*
    298 F.3d 893 (9th Cir. 2002) .....................................................................6

*Hanon v. Dataproducts Corp.*
    976 F.2d 497 (9th Cir. 1992) .....................................................................9

*In re 2TheMart.com, Inc. Sec. Litig.*
    114 F. Supp. 2d 955 (C.D. Cal. 2000) .....................................................18

*In re Amgen Inc. Secs. Litig.*
    544 F. Supp. 2d 1009 (C.D. Cal. 2008) ...............................................9, 18

*In re Gilead Scis. Sec. Litig.*
    536 F.3d 1049 (9th Cir. Cal. 2008) ..........................................................18

*In re Immune Response Sec. Litig.*
    375 F. Supp. 2d 983 (S.D. Cal. 2005).......................................................9

*In re Marsh & McLennan Co.*
    501 F. Supp. 2d 452 (S.D.N.Y. 2006).......................................................16

*In re Metro. Sec. Litig.*
   532 F. Supp. 2d 1260 (E.D. Wash. 2007) .................................................................11

*In re Omnivision Techs., Inc.*
   2005 U.S. Dist. LEXIS 16009 (N.D. Cal. July 29, 2005) ...........................................19

*In re Thoratec Corp. Sec. Litig.*
   2006 U.S. Dist. LEXIS 30602 (N.D. Cal. May 10, 2006) ............................................9

*In re Turnstone Sys., Inc. Sec. Litig.*
   2003 U.S. Dist. LEXIS 26709 (N.D. Cal. Feb. 4, 2003) ........................................9, 18

*In re USA Talks.com, Inc. Sec. Litig.*
   2000 U.S. Dist. LEXIS 14823 (S.D. Cal. Sep. 14, 2000) ...........................................18

*Interstate Natural Gas Co. v. Southern California Gas Co.*
   209 F.2d 380 (9th Cir. 1953) ......................................................................................4

*Katz v. Image Innovations Holdings, Inc.*
   542 F. Supp. 2d 269 (S.D.N.Y. 2008) .........................................................................13

*Lormand v. US Unwired, Inc.*
   2009 U.S. App. LEXIS 7452 (5th Cir. Apr. 9, 2009) ..................................................13

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*
   513 F.3d 702 (7th Cir. 2008) .......................................................................................15

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*
   540 F.3d 1049 (9th Cir. 2008 .....................................................................................20

*Provenz v. Miller*
   102 F.3d 1478 (9th Cir. 1996) ................................................................................9, 12

*Reshal Assocs., Inc. v. Long Grove Trading Co.*
   754 F. Supp. 1226 (N.D. Ill. 1990) .............................................................................20

*Ruiz v. Gap, Inc.*
   540 F. Supp. 2d 1121 (N.D. Cal. 2008) ......................................................................17

*Sanders v. Kennedy*
   794 F.2d 478 (9th Cir. 1986) ........................................................................................6

*South Ferry LP v. Killinger*
   542 F.3d 776 (9th Cir. 2008) ......................................................................................12

*SEC v. GLT Dain Rauscher, Inc.*
   254 F.3d 852 (9th Cir. 2001) ......................................................................................16

*SEC v. Stanard*
   2009 U.S. Dist. LEXIS 6068 (S.D.N.Y. Jan. 27, 2009) .............................................14

*SEC v. Tambone*
   550 F.3d 106 (1st Cir. 2008) .......................................................................................14

*Seippel v. Sidley, Austin, Brown & Wood, LLP*
    399 F. Supp. 2d 283 (S.D.N.Y. 2005)........................................................7, 8

*Siemers v. Wells Fargo & Co.*
    2006 U.S. Dist. LEXIS 60858 (N.D. Cal. Aug. 14, 2006)..............................11

*South Ferry LP v. Killinger*
    542 F.3d 776 (9th Cir. 2008) .................................................................12, 13

*Special Situations Cayman Fund, L.P. v. Dot Com Entertainment. Group, Inc.*
    2003 U.S. Dist. LEXIS 25083 (W.D.N.Y. Dec. 5, 2003)................................19

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*
    250 F.3d 87 (2d. Cir. 2001)..............................................................7, 8, 16

*Swartz v. KPMG LLP*
    476 F.3d 756 (9th Cir. 2007) ........................................................................6

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*
    531 F.3d 190 (2d Cir. 2008)…………………………………………….15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
    551 U.S. 308 (2007)................................................................................ 12-14

*Wojtunik v. Kealy*
    2006 U.S. Dist. LEXIS 73448 (D. Ariz. Sept. 30, 2006)................................19


**Statutes**

15 U.S.C. § 78u-4(b)(2) ...................................................................................12


**Rules**

Fed. R. Civ. P. 8(a)(2)........................................................................................19

Fed. R. Civ. P. 9(b) .............................................................................................6

Fed. R. Civ. P. 12(b)(6)........................................................................................6

## SUMMARY OF ARGUMENT

In this class action, Plaintiffs allege that five Wells Fargo affiliates violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 by engaging in a fraudulent scheme to sell $3.9 billion in auction rate securities ("ARS") to investors as highly liquid, cash-alternatives.  Plaintiffs allege that Defendants failed to disclose material facts relating to the liquidity and risk characteristics of those securities, including the extent to which broker-dealers sustained the ARS market by systematically placing "support bids" in the auctions at which those securities were traded.  When all major broker-dealers simultaneously withdrew their support for the ARS market, the façade of liquidity disappeared and thousands of investors were left holding illiquid securities sold to them by Defendants as cash equivalents.  With the collapse of the market, the true value of the securities was revealed and they can now be sold only at a substantial loss.  A few months after this class action was filed, Congress and securities regulators confirmed that the ARS market had been rigged and investors defrauded.  These same Wells Fargo entities are also now the subject of proceedings by state securities regulators over their ARS sales practices.

In moving to dismiss, Defendants incorrectly argue that the First Amended Class Action Complaint ("Complaint") improperly groups all Defendants and does not identify the conduct of each Wells Fargo entity.  Through specific factual allegations, the Complaint delineates the roles each Wells Fargo entity played in the fraudulent scheme and the material omissions and misrepresentations made to Plaintiffs and other investors with sufficient particularity.  Although Defendants claim they had only "limited involvement in ARS," the Complaint alleges in detail that, as a result of their substantial participation in the ARS market as an underwriter, broker-dealer, remarketer, and auction agent, Defendants knew that they had falsely described the liquidity features of ARS and failed to disclose the ever-increasing risk that the ARS market would collapse in the absence of broker-dealer support.  As Defendants knew that the ARS market was at increased risk of collapse, it is implausible for them now to suggest they had truly believed "ARS would continue to be safe, liquid investments."

Defendants also assert that all material facts about ARS were known to the market, constituting a "truth-on-the-market" defense to Plaintiffs' allegations of material omissions, reliance, and loss causation.  These challenges are both premature and meritless.  The vague and generalized statements in

1

1
2
3
4
5
6
7

the articles, prospectuses and other materials Defendants submit in support of their motion fail to reveal that the auction market was sustained only through the pervasive intervention of all major broker-dealers, that those broker-dealers could withdraw their "support" for the auctions at any time, and that investors would be indefinitely stuck with illiquid securities. The SEC has recognized that these risks were never disclosed to ARS investors before the market collapsed. As the Complaint provides ample grounds for Plaintiffs' claims with abundant facts to raise a reasonable expectation that discovery will uncover supporting evidence, Defendants' motion to dismiss should be denied.

8

## STATEMENT OF FACTS

9

### A.   The Mechanics of ARS

10
11
12
13
14
15
16
17
18
19

According to various securities regulators—including the SEC, state attorneys general, the Secretary of the Commonwealth of Massachusetts, the North American Securities Administrators Association, and the Financial Industry Regulatory Authority—the financial firms participating in the ARS market sold the securities as cash or money market alternatives. (Plaintiffs' RJN, Exs. 1-4.) In actuality, ARS are not like money market funds or short-term securities that can be readily liquidated, but instead are securities with long term or indefinite maturities. ARS typically traded at par value through periodic auctions that set the interest rates every 7, 28 or 35 days. By February 2008, about $330 billion in ARS were outstanding. ARS were sold to investors by broker-dealers that had entered into agreements to manage ARS auctions, or by other designated brokerages often referred to as "remarketing agents." (¶¶ 33-44.)[1]

20
21
22
23
24
25
26

An auction was successful if more shares were bid for purchase than were offered for sale, but failed if the number of shares offered for sale exceeded those bid for purchase. If the auction failed, current holders could not sell their securities, and an interest rate called the "maximum rate" would apply until the next auction. The maximum rate was, in theory, supposed to restore liquidity by attracting buyers to the next auction or by prompting the issuer to redeem the securities. Unbeknownst to ARS investors, the maximum rate on most ARS issues was not high enough to attract liquidity. (¶¶ 50-55.) Many issues had "rate caps" that, when triggered, reset the applicable rate well below that

27
28

[1]   Citations to "¶ __" refer to the First Amended Class Action Complaint.

for comparable securities, often as low as zero.  (¶ 99(c).)  ARS also lacked a "put" feature to allow the holder to sell the securities back to the broker-dealer at par value or to force issuer redemptions.  As a result, failed auctions left holders with illiquid, low-yielding ARS.  (¶ 56.)

### B.   Broker-Dealers Engaged In Widespread Manipulation Of The ARS Market.

Broker-dealers underwrote billions of dollars in ARS with maximum rates that were too low to attract purchasers if the auctions failed.  Broker-dealers sustained the market by systematically intervening in the auctions to prevent failures and depress the rates of interest paid on the ARS.  As interest rates generally reflect the risk associated with a particular security, by reducing interest rates, broker-dealers concealed the true risks of investing in ARS.  (¶¶ 57-74.)

In the course of managing auctions, broker-dealers were privy to all bids placed and knew when an auction would fail due to insufficient demand.  To ensure that the auction would clear, broker-dealers systematically placed "support bids," purchasing ARS for their own accounts.  For example, between 2006 and 2008, broker-dealers UBS and Merrill Lynch intervened in more than 60,000 auctions, preventing the vast majority from failing.  Investors had no way of knowing the frequency of the interventions or that the interventions were necessary to perpetuate the appearance of liquidity and sustain the ARS market.  (¶¶ 61-66.)  In essence, consistent intervention by broker-dealers rendered the periodic rate-setting events "auctions" in name only.

### C.   Without Broker-Dealer Support, The ARS Market Immediately Collapsed

In August 2007, several broker-dealers withdrew their support for certain auctions, allowing them to fail.  Although some of Defendants' brokerage clients had invested in failing ARS issues, Defendants did not notify their other clients about these auction failures.  In fact, Wells Fargo's auction trading desk continued to instruct its sales force to sell ARS as safe, liquid investments.  (¶¶ 77-85.)  On or around February 13, 2008—without prior notice to investors—all major broker-dealers withdrew their support for the ARS market, and over $300 billion in securities immediately became illiquid. Defendants chose to exploit the collapse of the ARS market by offering to make margin loans to their investor clients using their ARS as collateral—in effect, loaning ARS investors back their own money at a profit.  (¶¶ 86-89.)

### D.   Wells Fargo Occupied Multiple Roles In The ARS Market

Defendants engaged in a concerted scheme to defraud investors through the sale of ARS.  Each Wells Fargo entity played a particular role in the scheme.  Wells Fargo Bank, N.A. (the "Bank") steered bank depositors to employees of the Brokerage Entities—Wells Fargo Investments, LLC ("WFI"), Wells Fargo Institutional Securities, LLC ("WFIS"), and Wells Fargo Brokerage Services, LLC ("WFBS")— so these entities could offer customers ARS instead of money market accounts.  Employees of the Brokerage Entities worked inside the same branch offices as employees of the Bank, and the majority of the Brokerage Entities' $3.9 billion in ARS sales came from banking referrals.  (¶¶ 90-92.)

WFIS also acted as an underwriter and broker-dealer for ARS.  As broker-dealer, WFIS placed "support" bids at ARS auctions, without which those auctions would have failed.  (¶ 93.)[2]  The Bank also served as an auction agent for numerous ARS, including at least 5 issues that Merrill Lynch allowed to fail in August 2007.  As an auction agent, the Bank had intimate knowledge of the bids and broker-dealer interventions for those auctions.  As an auction agent, the Bank helped sustain the ARS market by allowing broker-dealers to intervene to set clearing rates and prevent auction failures.  (¶¶ 18, 80, 94.)  Thus, the same bank that was steering its clients into ARS knew that behind the scenes, broker-dealers were systematically placing support bids to ensure there would be no auction failures.

By virtue of their activities in the ARS market, Defendants were fully acquainted with the liquidity features and risk characteristics of those securities.  Defendants knew that ARS were not liquid cash equivalents, but were long-term securities.  Defendants knew that the auction market operated without transparency to investors and that broker-dealers were systematically intervening in auctions to sustain the appearance of liquidity and stability of the market.  Defendants also knew that rates of return were set by broker-dealers, rather than set at competitive Dutch auctions.  (¶¶ 81, 94-96.)

### E.   Wells Fargo Failed To Disclose Material Facts about ARS.

Defendants' sales practices deprived investors of adequate means to assess the risks of investing in ARS.  The Brokerage Entities uniformly failed to disclose to investors, including Plaintiffs, each of

---

[2]   The Court can take judicial notice of regulatory filings identifying WFIS as the underwriter and broker-dealer for certain ARS.  *See Interstate Natural Gas Co. v. Southern California Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953).

- 4 -

the following material facts:

- ARS appeared to be liquid investments only because of the extensive and sustained interventions in the auctions by broker-dealers, and in the absence of such "support," the auctions would have failed *en masse*;

- Rates of return on ARS were not set at arm's length auctions, but rather were managed by broker-dealers for their own benefit; and

- The manipulation of the auctions prevented investors from learning the true risk, value and liquidity feature of ARS.  (¶¶ 99-100.)

Investors stood no chance of learning the truth from Defendants' sales representatives, who lacked even a rudimentary understanding about ARS.  Defendants failed to provide mandatory instruction or ARS compliance training to their brokers, even though those brokers were required to undergo training before selling other complex investment products.  (¶¶ 101-03.)  Defendants directed their brokers through written materials and uniform sales presentations to sell ARS as safe, liquid, cash alternatives well suited for short-term investing.  (¶¶ 97, 156-59.)[3]  As a matter of practice, Defendants failed to deliver ARS prospectuses to investors who had purchased those securities.  (¶ 104.)

### F.    State Securities Regulators Charge Wells Fargo With Fraud

Months after this action was filed, securities regulators in Washington and California sued WFI, WFIS and WFBS for, among other things, making omissions of material fact in the offer and sale of ARS, and selling ARS by means of a manipulative, deceptive or other fraudulent scheme, device or contrivance.  (¶¶ 105-07; Plaintiffs' RJN, Ex. 5-6.)

### G.    Plaintiffs' ARS Purchases

Lead Plaintiffs Lindell Van Dyke and Sandra Olsen bought ARS from Defendants.  Mr. Van Dyke and Ms. Olsen were unfamiliar with and had not considered buying ARS until solicited to do so by Wells Fargo employees.  During visits to his local Wells Fargo branch, Mr. Van Dyke's personal banker solicited him to purchase ARS by describing those securities as safe cash-management products that provided liquidity on seven days notice.  Mr. Van Dyke's personal banker, an employee of the Bank, then steered him to a neighboring WFI broker in the same branch office to finalize the sales transactions.

---

[3]    By contrast, since at least March 2005, the "Big Four" accounting firms, the Financial Accounting Standards Board and the SEC had all adopted the position that ARS do not qualify as cash equivalents because of their long maturity periods and lack of liquidity guarantee.  (¶ 98.)

Mr. Van Dyke first purchased and sold ARS in June and July of 2007. Following another similar conversation with his personal banker in January 2008, Mr. Van Dyke purchased ARS that became illiquid when the ARS market collapsed the next month. (¶¶ 108-21 & Attach. A.)

Ms. Olsen purchased ARS in May 2007, after her Wells Fargo financial consultant recommended that she open a brokerage account at WFI and invest funds she needed to pay an upcoming tax bill in conservative, short-term, safe investments that could be liquidated on seven days notice. These securities became illiquid when the ARS market collapsed in February 2008. (¶¶ 122-29 & Attach. A.) No Wells Fargo employee told Plaintiffs of the material facts about ARS described above. Defendants never provided Plaintiffs with a written description of their ARS practices and procedures or other risk disclosures before or at the time of their purchases. (¶¶ 119-21, 126-29.)

## ARGUMENT

## I.   PLAINTIFFS STATE CLAIMS UNDER SECTION 10(b).

### A.   Legal Standard On A Motion To Dismiss

A motion to dismiss is proper under Fed. R. Civ. P. 12(b)(6) only where the pleading fails to state a claim upon which relief can be granted. The complaint must be construed in the light most favorable to the non-moving party and all material allegations in the complaint are taken to be true. *Sanders v. Kennedy*, 794 F.2d 478, 481 (9th Cir. 1986). The pleading must allege plausible grounds for relief. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007). Claims under section 10(b) also must meet the heightened pleading standards set forth in Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995. *See Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002). "In ruling on a 12(b)(6) motion, a court may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007).

### B.   Plaintiffs Allege Defendants' Misconduct With Requisite Specificity

#### 1.   Wells Fargo Institutional Securities And Wells Fargo Brokerage Services

Defendants contend that WFIS and WFBS are not alleged to have engaged in any actionable conduct. (Defs.' Mem. Supp. Mot. Dismiss ("Mem.") at 7.) As explained in the discussion of scienter below, each named Defendant is an operating subsidiary of the holding company Wells Fargo & Co. and

- 6 -

played a role in the scheme alleged by Plaintiffs. Working in tandem with each other and the Bank, WFIS and WFBS sold ARS to institutional and high-net-worth individual investors. (¶¶ 16-17, 91-92.) In addition, WFIS underwrote ARS issues, served as the broker-dealer for those securities, and intervened in the auctions. (¶ 93; Plaintiffs' RJN, Exs. 7-9.) Through this conduct, Defendants gained material factual information about ARS and the auction market that they failed to disclose to buyers of the securities, notwithstanding their obligation to do so. (¶¶ 95-96.)[4]

### 2. Wells Fargo Investments

Defendants also claim Plaintiffs have not alleged any omissions or misrepresentations by WFI in selling ARS to them. (Mem. at 7.) The Complaint describes in detail Mr. Van Dyke's conversations with Rebecca Schaefer, an employee of the Bank. After pitching ARS to Mr. Van Dyke, Ms. Schaefer directed him to Judy Keng, an employee of WFI who worked in the same branch office, to finalize the sales. At no time did Ms. Schaefer or Ms. Keng disclose any of the material facts concerning ARS and the auction market identified in the Complaint. (¶ 119-21.) Mr. Van Dyke's experiences are consistent with Defendants' scheme to steer customers of the Bank to the Brokerage Entities for ARS sales.

As alleged in the Complaint, WFI and the Bank cooperated extensively to promote and sell ARS. (¶¶ 91-92.) WFI sales agents generally worked out of Bank branches, and Bank employees were given financial incentives to refer investors to WFI. (¶ 92.) The majority of WFI's ARS sales came from Bank referrals. (*Id.*) Thus, it is reasonable to deem any omissions or misrepresentations by Ms. Schaefer as having been made on behalf of both the Bank and WFI. *See Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100-101 (2d. Cir. 2001) (upholding plaintiffs' scienter allegations against multiple related defendants based on the knowledge and actions of a single employee); *Seippel v. Sidley, Austin, Brown & Wood, LLP*, 399 F. Supp. 2d 283, 289, 295 (S.D.N.Y. 2005) (allegations that a non-employee "acting at the behest of and with the knowledge and authority of" defendants met the PSLRA's pleading requirements for misstatements by defendants). It is also reasonable to infer that the coordination between these entities came as a result of management

---

[4] Although these allegations are sufficient, to the extent the Court deems it necessary to allege claims by a purchaser of ARS from WFIS or WFBS, Plaintiffs respectfully request leave to amend to include such a purchaser.

1    directives, rather than mere fortuity.[5]

2         As for Plaintiff Olsen, the Complaint alleges she spoke with Donald Duarte, a financial

3    consultant in Wells Fargo's Newport Beach, California office.  (¶ 123.)  Defendants' suggestion that

4    they cannot identify Mr. Duarte or his employer is untenable.  All they have to do is look him up in their

5    employee directory.  Equally, whether Mr. Duarte is an employee of the Bank or WFI, it is reasonable to

6    deem any omissions or misrepresentations by him as having been made on behalf of both the Bank and

7    WFI, given that the promotion and sale of ARS to retail investors was a joint effort by both entities.  *See*

8    *Suez Equity Investors,* 250 F.3d at 100-101; *Seippel,* 399 F. Supp. 2d at 289, 295.  In any event, these

9    questions of fact are better suited for determination at summary judgment or trial.  *See id.*

10        Defendants incorrectly argue that Mr. Duarte is not alleged to have engaged in any deceptive

11   conduct.  (Mem. at 8.)  When Mr. Duarte solicited Ms. Olsen to open a Wells Fargo brokerage account,

12   she informed him that she sought a conservative product to set aside money that could be readily

13   liquidated to enable her to pay a large tax bill.  (¶¶ 124-25.)  Mr. Duarte said a Wells Fargo bond trader

14   would identify bonds that met Ms. Olsen's criteria.  (¶ 124.)  WFI then used almost all the money in

15   question to buy ARS for Ms. Olsen's account.  (¶ 125.)  At no time did Mr. Duarte or any other Wells

16   Fargo employee disclose the material facts about ARS and the auction market described in the

17   Complaint.  (¶¶ 126-29.)  Instead, Mr. Duarte falsely told Ms. Olsen the money had been invested in

18   bonds that she could liquidate at any time on one week's notice.  (¶ 125.)  ARS were *not* a safe, short-

19   term vehicle to park money temporarily.  Ms. Olsen could not liquidate the securities on one week's

20

21   _____

     [5]      Wells Fargo points out that counsel for plaintiffs have alleged in other auction rate matters that

22   "uniform sales presentations" were employed pursuant to "management directives."  (Mem. at 13 n.3.)
     Where regulators have made internal communications relating to the sale of auction rate securities

23   public, those communications have confirmed Plaintiffs' allegations and further established a deliberate
     and highly coordinated effort by the broker-dealers to unload ARS on their customers prior to the market

24   collapse they knew would follow their withdrawal of support for the market.  *See, e.g.,* *In the Matter of
     UBS Securities, LLC and UBS Financial Services, Inc.,* Administrative Complaint, Commonwealth of

25   Massachusetts, Office of the Secretary of the Commonwealth Securities Division, Docket No. 2008-
     0045 at ¶¶ 139, 175, 193-194, 196-201, 202, 211, 213-216, 219-223, 292, 308-325, 328 (complaint and

26   exhibits available at  http://www.sec.state.ma.us/sct/sctubs2/ubs2idx.htm); *In the Matter of Merrill
     Lynch, Pierce, Fenner & Smith, Inc.,* Administrative Complaint, Commonwealth of Massachusetts,

27   Office of the Secretary of the Commonwealth Securities Division, Docket No. 2008-0058 at ¶¶ 157-159,
     175, 179, 183-190, 200-222, 229-2240, 295-299, 305-306, 310-312 (complaint and exhibits available at

28   http://www.sec.state.ma.us/sct/sctml2/ml2idx.htm).

notice and, since February 2008, has been unable to liquidate the securities at auction.  The claim that Mr. Duarte made no omissions or misrepresentations to Ms. Olsen is meritless.

### 3.   Defendants' "Truth On The Market" Argument Rests On Erroneous Premises And Raises Disputed Factual Issues.

Defendants argue that they had no duty to disclose the omitted material facts about ARS and the auction market alleged in the Complaint because all material information about ARS had been revealed to the market previously.  (Mem. at 8.)[6]  Defendants' assertion that "there is no duty to disclose information that is in the public domain," (*id.*) while true in the abstract, has no application here.

For a truth-on-the-market defense to succeed, "[t]he information [omitted by defendant] . . . must have been transmitted to the public with sufficient intensity to dispel any misleading impression created by the [defendant's] representations." *In re Turnstone Sys., Inc. Sec. Litig.*, No. C-01-1256-SBA, 2003 U.S. Dist. LEXIS 26709, at *128 (N.D. Cal. Feb. 4, 2003) (citing *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996)).  When the argument is made on summary judgment, "[t]he defendants bear a heavy burden of proof.  Summary judgment is proper only if they show that 'no rational jury could find' that the market was misled." *Provenz*, 102 F.3d at 1493.  "If 'the evidence presents a sufficient disagreement to require submission to the jury,' summary judgment should be denied." *Id.*  A defendant faces an even heavier burden on a motion to dismiss based solely on the allegations in the complaint, where the plaintiff has not had an opportunity to present evidence.  Given the factual issues raised by the argument, "courts generally may not dismiss a complaint on the basis of a truth-on-the-market defense. . . ." *In re Thoratec Corp. Sec. Litig.*, No. C-04-03168-RMW, 2006 U.S. Dist. LEXIS 30602, at *33-34 (N.D. Cal. May 10, 2006); *accord In re Amgen, Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1037 (S.D. Cal. 2005). Defendants' submissions show why a truth-on-the-market defense is inappropriate at the pleading stage.

Plaintiffs allege that (a) ARS appeared liquid because broker-dealers systematically intervened in the auctions to prop them up; (b) the auctions would have failed *en masse* without such intervention;

---

[6]   Defendants do not dispute that "Rule 10b-5 'imposes a duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading.'" *In re Amgen Inc. Secs. Litig.*, 544 F. Supp. 2d 1009, 1030 (C.D. Cal. 2008) (quoting *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 504 (9th Cir. 1992)).

- 9 -

(c) by intervening in the auctions, broker-dealers manipulated and depressed the clearing rates for ARS; (d) broker-dealers acted in concert with each other, knowing that if any single broker-dealer allowed widespread auction failures, a "run on the bank" would ensue and the entire market would collapse; (e) if the ARS market collapsed, investors would be forced to hold the securities indefinitely.

The materials relied on by Defendants for their truth-on-the-market defense paint a far more subdued picture, however, and fall well short of adequate disclosure. The May 2006 consent decree between the SEC and various broker-dealers said that "[w]ithout adequate disclosure, certain Respondents bid to prevent auctions from failing. . . . These Respondents submitted bids to ensure that all of the securities would be purchased to avoid failed auctions and thereby, in certain instances, affected the clearing rate . . . ." (RJN, Ex. A ¶ 2(a)(b.1), at 6.) The order directed the broker-dealers to provide a written description of their auction procedures to their ARS customers. The order gave the impression that only some broker-dealers intervened in only some of the auctions from time to time, and that the practice was acceptable so long as it was adequately disclosed. The order did not direct broker-dealers to disclose their intervention practices to investors who bought ARS from remarketing agents like Wells Fargo. In fact, the order did not apply to Wells Fargo at all. After the collapse of the ARS market, the SEC recognized that the disclosures provided by these broker-dealers were inadequate to place the public on notice of the risks of investing in ARS. (Plaintiffs' RJN, Exs. 10-13.)

The media reports cited by Defendants concerning the SEC order were even less enlightening, as they said nothing whatsoever about the nature and extent of broker-dealer interventions to prevent auction failures. These items reported only SEC findings that:

- Broker-dealers "improperly allowed customers to place certain orders in auctions, submitted or changed orders after auction deadlines and gave some customers information that gave them unfair advantages about what rate to bid." (RJN, Ex. L.)

- Three auction agents (not including Wells Fargo) "allowed broker-dealers to intervene in auctions. . . ." (RJN, Ex. M.)

- "[T]he banks accepted initial or revised bids after submission deadlines and allowed brokerage firms to intervene in auctions. In some cases, this conduct affected the rate paid on the securities." (RJN, Ex. N.)

These articles neither explained what it meant to "intervene" in an auction nor hinted at the massive intervention by all major broker-dealers to prop up the entire ARS market. On the contrary, the reports

- 10 -

tend to create the impression the ARS market was closely regulated.

The articles from 2005 submitted by Defendants say nothing about how the market was sustained through the intervention of the major broker-dealers, and that investors could be stuck with illiquid securities if the broker-dealers backed away from the market. The articles were affirmatively misleading in stating that, "in the event an auction fails, existing investors are left holding their securities *until the next auction*, with no access to their funds." (RJN, Ex. O (emphasis added); *see also* RJN, Ex. P ("Should the auction fail, . . . existing investors would have to hold on to the securities—and would be able to [sic] access their funds—*until the next auction*.") (emphasis added).) These statements gave the inaccurate impression that if an auction failed, the worst that could happen was that investors would merely have to wait until the next auction to sell their ARS. Given that the ARS market could not exist without extensive intervention by all major broker-dealers, the worst that actually could happen was precisely what occurred: broker-dealers withdrew their support, and the auctions ceased; there is no "next auction" at which investors could sell; and their principal is now tied up indefinitely.

The prospectus pages submitted by Defendants were in some ways the least informative. As an initial matter, Defendants' practice was not to provide prospectuses to ARS investors. (¶ 104.) Moreover, the prospectuses, which were filed with the SEC in 2002 and earlier, spoke only in terms of generalities and possibilities. The point is starkly illustrated by the very prospectus excerpts quoted on page 10 of Defendants' brief: they speak only of the possibility that broker-dealers *might* from time to time bid for their own accounts in auctions, or that an auction *might* fail. The prospectuses did not warn that the entire ARS market was subject to massive manipulation by all major broker-dealers, and that if they decided to let the market collapse, ARS holders would be left with overvalued, illiquid securities. Moreover, the generalized warnings in the prospectuses had become obsolete by the time of Plaintiffs' purchases, as broker-dealer intervention was a reality, not merely a risk. All the major broker-dealers were *already* intervening on a pervasive basis to sustain the auction market. (¶¶ 61-62.) *Cf. In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1292 (E.D. Wash. 2007) ("[T]o suggest that an event is a possibility when it is, in fact, a certainty is necessarily misleading."); *Siemers v. Wells Fargo & Co.*, No. C-05-4518-WHA, 2006 U.S. Dist. LEXIS 60858, at *16-17 (N.D. Cal. Aug. 14, 2006) ("The representation left the impression that the payback arrangement might (or might not) materialize when it

- 11 -

1   was, in reality, already a done deal.  This was misleading.").

2          Defendants also make no effort to show the materials they submit here actually were

3   "transmitted to the public with a degree of intensity and credibility sufficient to effectively

4   counterbalance any misleading impression created by [their] one-sided representations."  *Provenz*,

5   102 F.3d at 1492-93 (internal quotation marks omitted).  In other words, it is not enough for Defendants

6   simply to cite some media reports and have the Court assume the reports had a corrective effect on the

7   market.  Defendants must prove the matter, something they have failed even to attempt to do.

8          "Whether an omission is 'material' is a determination that 'requires delicate assessments of the

9   inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those

10  inferences to him, and these assessments are peculiarly ones for the trier of fact."  *Fecht v. Price Co.*,

11  70 F.3d 1078, 1080-1081 (9th Cir. 1995).  "Similarly whether a public statement is misleading, or

12  whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact."

13  *Id.*.  "[O]nly if the adequacy of the disclosure or the materiality of the statement is 'so obvious that

14  reasonable minds [could] not differ' are these issues 'appropriately resolved as a matter of law.'"  *Id.*

15  Defendants' assertion of a truth-on-the-market defense at the pleading stage imposes on Defendants a

16  high burden they have not met.  Defendants' motion to dismiss on this ground should be denied.

17          **C.      Plaintiffs Sufficiently Allege Scienter.**

18          **1.      Standard For Pleading Scienter**

19          To state a section 10(b) claim, plaintiff must plead facts giving rise to a strong inference that

20  defendant acted with the required state of mind, or scienter.  15 U.S.C. § 78u-4(b)(2).  "[T]he plaintiffs

21  must show that defendants engaged in '*knowing*' or '*intentional*' conduct. . . .  [R]eckless conduct can

22  also meet this standard 'to the extent that it reflects some degree of intentional or conscious

23  misconduct,' or what we have called 'deliberate recklessness.'"  *South Ferry LP v. Killinger*, 542 F.3d

24  776, 782 (9th Cir. 2008) (citation omitted; original emphasis).  "[T]he court's job is not to scrutinize

25  each allegation in isolation but *to assess all the allegations holistically*.  In sum, the reviewing court

26  must ask:  *When the allegations are accepted as true and taken collectively*, would a reasonable person

27  deem the inference of scienter at least as strong as any opposing inference?"  *Tellabs, Inc. v. Makor*

28  *Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007) (citation omitted; emphasis added).

"*Tellabs* permits a series of less precise allegations to be read together to meet the PSLRA requirement . . . . Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter." *South Ferry*, 542 F.3d at 784. "[F]ederal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *Id.* "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324 (citations omitted). If an inference of scienter can be drawn from the allegations that is equally as strong as a contrary inference, a tie goes to the plaintiff. *See Lormand v. US Unwired, Inc.*, No. 07-30106, Fed. Sec. L. Rep. (CCH) ¶ 95,205, 2009 U.S. App. LEXIS 7452, at *72 (5th Cir. Apr. 9, 2009).

**2.    The Allegations Here Give Rise To A Sufficient Inference Of Scienter.**

Plaintiffs' allegations support an inference that Defendants acted intentionally or with deliberate recklessness. Plaintiffs allege that Defendants engaged in a scheme to sell ARS as safe, highly liquid investments, while knowing that the apparent liquidity existed only because the major broker-dealers intervened in the auctions on a systematic basis to prevent them from failing. Plaintiffs further allege that Defendants knew there was an ever-increasing likelihood the broker-dealers would withdraw their support, the ARS market would collapse, and investors would be left with illiquid securities.

In support of these allegations, Plaintiffs plead the following facts. In a joint effort to sell ARS, the Bank steered its customers to the Brokerage Entities, whose sales agents were generally stationed in Bank branches. (¶ 92.) Bank employees were given financial incentives for ARS referrals, as Defendants would have earned little or no revenue for placing customers in other cash management vehicles such as money market funds. (¶¶ 92-93, 136.) The majority of the Brokerage Entities' $3.9 billion in ARS sales were the result of Bank referrals. (¶ 92.) *See Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) ("[T]he magnitude of the alleged fraud provides some additional circumstantial evidence of scienter."). Defendants knew of the increased risks of auction failures, but chose not to communicate that risk to their customers, as confirmed by a November 2007 document prepared for the Bank's trust officers and given very limited circulation. The document recommended against the purchase of ARS, but the Brokerage Entities nevertheless continued

- 13 -

to instruct their sales forces to sell ARS as safe, liquid investments. (¶ 84.) *See SEC v. Stanard*, No. 06 Civ. 7736 (GEL), 2009 U.S. Dist. LEXIS 6068, at *78-79 (S.D.N.Y. Jan. 27, 2009) ("[A] defendant cannot plead ignorance of the facts where there are warning signs or information that should have put him on notice of either misrepresented or undisclosed material facts."). Despite knowing that several broker-dealers allowed auctions to fail in 2007 and 2008, Defendants perpetuated the ARS market until just before it collapsed, not merely to obtain general incentive compensation, but to expand their growing interests as an underwriter, broker-dealer, and auction agent for ARS. (¶¶ 85, 131-36.)

WFIS served as an underwriter for certain ARS issues (¶ 93; Plaintiffs' RJN, Ex. ___), and in that capacity, had "access to information of substantive interest and consequence to investors, and a concomitant duty to investigate and confirm the accuracy of the prospectuses and other fund materials that they distribute." *SEC v. Tambone,* 550 F.3d 106, 135 (1st Cir. 2008) (imposing Rule 10b-5(b) liability on underwriters who failed to ensure truthfulness and completeness of offerings). As a broker-dealer for the ARS that it had underwritten, WFIS intervened in the auctions to prevent failures. (¶ 93.)

The Bank served as an auction agent, and in that capacity was privy to all bids at auction, allowed broker-dealers to place support bids, and knew when those support bids set clearing rates and prevented auction failures. (¶¶ 18, 94.) The Bank served as the auction agent for at least five issues that Merrill Lynch allowed to fail in August 2007. (¶¶ 80, 94.) The Bank knew that those failures were not isolated instances involving the insolvency of a single broker-dealer or the credit downgrade of a single issuer, but rather occurred because several broker-dealers had broken with precedent and refused to support the auctions. (¶ 81.) Although certain clients of the Brokerage Entities had invested in ARS that failed, the Brokerage Entities did not disclose these failures to their other investor clients. (¶ 80.)

Defendants largely ignore these allegations and insist that absent a "smoking gun," Plaintiffs fail to plead scienter. Taken as a whole, however, and read with a commonsense perspective, the allegations are sufficient to support a strong inference that Defendants understood that the ARS market was rigged and understood, or were deliberately reckless in turning a blind eye to, the risks their customers faced in investing in ARS. Plaintiffs' inference of scienter is far more cogent and compelling than the "opposing inference of nonfraudulent intent" that Defendants argue. *Tellabs*, 551 U.S. at 314. Defendants now contend they actually "thought the securities, which had been in existence for nearly twenty-five years

- 14 -

without market disruption, were safe, liquid investments." (Mem. at 14.)  In light of their substantial participation in the ARS market as a remarketing agent, underwriter, broker-dealer, and auction agent, however, Defendants' assertion that they were insufficiently acquainted with the liquidity features and risk characteristics of the securities they managed, underwrote, administered and sold, is simply not plausible.  Defendants played every conceivable position on the auction rate "team."  Defendants cannot seriously contend that by the time Plaintiffs purchased ARS in 2007 and 2008 (just months before the collapse of the ARS market), Defendants were still unaware that the major broker-dealers pervasively manipulated the ARS market to maintain the appearance liquidity, and that the market was under increasing strain and teetering on the verge of collapse.[7]  Where, as here, "there are only two possible inferences, and one [favoring scienter] is *much* more likely than the other, it must be cogent."  *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (emphasis in original).

### 3.    Defendants' Piecemeal Criticisms Of The Scienter Allegations Lack Merit

Unable to muster a more compelling inference of nonfraudulent intent, Defendants attempt to attack Plaintiffs' scienter allegations on a scattershot basis.  Defendants argue that Plaintiffs have not identified the specific corporate personnel who acted with intent to defraud.  (Mem. at 12-13.)    To the contrary, "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud."  *Makor*, 513 F.3d at 710; *see also Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("[I]t is possible to raise the required inference [of scienter] with regard to a corporate defendant without doing so with regard to a specific individual defendant.").  Here, the Brokerage Entities' omissions of material fact about ARS "were so important and so dramatically false that they [created] a strong inference that at least *some* corporate officials knew of the falsity upon publication."  *Glazer Capital Management, LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008) (citing *Makor*, 513 F.3d at 710).[8]

---

[7]    Plaintiffs' claims do not require a finding that the ARS market was propped up for more than two decades.  Rather, Plaintiffs allege that by the start of the class period in 2003, and certainly no later than Plaintiffs' purchases of ARS in 2007 and 2008, the market was being propped up and manipulated by broker-dealers, and Defendants knew or were deliberately reckless in not knowing that fact.

[8]    Defendants incorrectly cite *Glazer Capital Management*, 549 F.3d at 745, for the proposition that the Ninth Circuit has rejected the "collective scienter" theory.  (Mem. at 12.)  In fact, *Glazer* notes that

- 15 -

Defendants suggest that their sales agents' omissions are not indicative of their own scienter. (Mem. at 12-13.)  Despite the fact that securities brokers are obligated to investigate the securities they offer to customers, *see SEC v. GLT Dain Rauscher, Inc.*, 254 F.3d 852, 857-58 (9th Cir. 2001), the Complaint alleges that Defendants kept their own sales force in the dark about how the ARS market functioned, and thus used their sales agents as vehicles to deceive investors.  (¶¶ 101-03.)  A corporation's misconduct is not confined to those employees serving on the front lines, to the exclusion of those who instruct and direct them.  *See, e.g., In re Marsh & McLennan Co.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("Confining the pool of employees from which a corporation's scienter may be inferred to those that made an underlying misstatement, as Defendants suggest, is unduly limiting.  This framework forecloses liability in situations where institutional fraud is readily perceivable but plaintiffs have yet to match a culpable employee with a public misstatement.").

Defendants also argue that the scienter allegations do not differentiate between the corporate entities named as defendants.  (Mem. at 12-13.)  To the contrary, the conduct of each Defendant is sufficiently identified.  Under the particular circumstances of this case, where Defendants are corporate affiliates and operating subsidiaries of a single holding company, Plaintiffs have properly pleaded the roles each Defendant played in the alleged scheme to defraud ARS investors.  *See Suez Equity Investors*, 250 F.3d at 100-101 (upholding scienter allegations against related defendants based on the knowledge and actions of single employee).  Defendants may not evade liability simply because their business operations were structured in a way that compartmentalized their functions in the ARS fraud.

### D.   Plaintiffs Sufficiently Allege Reliance.

#### 1.   Plaintiffs Are Entitled To A Presumption Of Reliance Under *Affiliated Ute* For The Class Claims

Defendants argue that a presumption of reliance on omissions does not apply to the class claims. (Mem. at 15.)[9]  Defendants' objection is actually a premature class certification argument.  *See, e.g.,*

---

Ninth Circuit precedent "does not foreclose the possibility that, in certain circumstances, some form of collective scienter pleading might be appropriate." *Id.* at 744.

[9]   Defendants do not expressly challenge the pleading of reliance with respect to Plaintiffs' individual claims.  Nor can they, as the Complaint describes Plaintiffs' interactions with Defendants' sales agents in detail; the omissions tainting the agents' statements; and Plaintiffs' reliance thereon.

*Ruiz v. Gap, Inc.*, 540 F. Supp. 2d 1121, 1124 (N.D. Cal. 2008) (Conti, J.) (declining to address "premature arguments regarding class certification").   At any rate, Plaintiffs are entitled to a presumption of reliance for the class claims.  *See Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972); *Blackie v. Barrack*, 524 F.2d 891, 905-07 (9th Cir. 1975).  As Defendants acknowledge, the presumption applies in cases involving primarily omissions, even if some affirmative misrepresentations are also alleged.  *See Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999) (reviewing decision to decertify the class and grant summary judgment).  This is such a case.  Although Plaintiffs allege Defendants made a few basic false statements in selling ARS—that the securities were safe, short-term, and highly liquid—the focus of the Complaint is on a host of facts that Defendants failed to disclose, despite their obligation to do so.  (¶¶ 156-61.)  These omissions include the following:

- ARS were not cash alternatives, but were financial instruments with long-term or indefinite maturity dates.

- ARS generally lacked features designed to ensure the holder's ability to sell the security, and in the event of an auction failure, the purchaser would be required to hold the security to maturity or indefinitely.

- ARS appeared readily liquid only because broker-dealers manipulated the auction market by pervasively intervening to prevent auction failures.

- In the event of persistent auction failures, ARS would be saleable only at a substantial discount from their purchase price.

- Broker-dealers set the clearing rate in most auctions in which they submitted bids, and did so for their own benefit at the expense of investors.

- By systematically manipulating the auctions and interest rates, broker-dealers prevented investors from learning the true risk, value, and liquidity features of ARS.

(¶¶ 99-100.)  The *Affiliate Ute* presumption of reliance applies here, as the "fraud-based claims stem primarily, if not exclusively, from these omission of material fact."  (¶ 161.)

### 2.    Plaintiffs Are Entitled To A Presumption Of Reliance For The Class Claims Under The Fraud-On-The-Market Theory

In addition, Defendants prematurely attempt to argue that Plaintiffs cannot demonstrate reliance on a class-wide basis under the "fraud-on-the-market" presumption in *Basic v. Levinson*, 485 U.S. 224, 242 (1988).  (Mem. at 16-17.)  Again, this argument is appropriately left for class certification proceedings, as the efficiency of a market is a question of fact that courts repeatedly refuse to address on

a motion to dismiss. *See, e.g., DeMarco v. Robertson Stephens Inc.*, 318 F. Supp. 2d 110, 121 (S.D.N.Y. 2004); *In re USA Talks.com, Inc. Sec. Litig.*, No. 99-CV-0162-L(JA), 2000 U.S. Dist. LEXIS 14823, at *14-16 (S.D. Cal. Sep. 14, 2000).

Defendants' argument fails in any event, as Plaintiffs allege ample facts to support an inference that Defendants perpetrated a fraud on the market. Plaintiffs allege that the ARS market had existed for over two decades; that material news had a prompt and immediate effect on the market price of ARS; and that Plaintiffs did not know about and could not have reasonably discovered Defendants' deceptive conduct when they purchased ARS. (¶¶ 155, 162-69.) These allegations of market efficiency are sufficient at the pleading stage. *See In re 2TheMart.com, Inc. Sec. Litig.*, 114 F. Supp. 2d 955, 963-65 (C.D. Cal. 2000) (finding presumption of reliance on motion to dismiss where plaintiff alleged relationship between disclosure of unexpected events and immediate response in stock price).

Defendants also argue that a presumption of reliance does not apply because the omitted facts had already all been disclosed to the market. (Mem. at 16.) Although this fact-specific "truth-on-the-market" defense should not be decided on a motion to dismiss, *see In re Turnstone Sys. Sec. Litig.*, 2003 U.S. Dist. LEXIS 26709, at *127-28, Plaintiffs have already refuted it, *see* Section I.B.3 supra. Moreover, a finding the truth had already been disclosed to the market would run counter to the conclusions of the SEC and a host of state securities regulators.

### E.   Plaintiffs Adequately Allege Economic Loss And Loss Causation.

Plaintiffs have adequately alleged economic loss. Without citation to any authority, Defendants contend that Plaintiffs must plead facts showing the actual decline in value of their ARS since the auction market collapsed. (Mem. at 17-18.) To the contrary, Plaintiffs need allege only that they were damaged by Defendants' conduct. *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1056 (9th Cir. Cal. 2008) (investors "sufficiently alleged . . . economic loss" where they "identif[ied] a specific economic loss: the drop in value on October 29, 2003, that followed the October 28 press release"); *In re Amgen Inc. Secs. Litig.*, 544 F. Supp. 2d at 1028 ("Plaintiffs have sufficiently plead economic loss by alleging drops in the price of Amgen stock from March 2007 on . . . ."). The Complaint easily satisfies this standard, alleging that Plaintiffs suffered damages by the loss of liquidity, diminished value of their securities, and receipt of artificially depressed rates of interest. (¶¶ 152-55.)

Defendants also mischaracterize the requirements for pleading loss causation.  To plead loss causation, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  The loss causation requirement is "not meant to impose a great burden upon a plaintiff" and simply requires a plaintiff to identify, in accordance with Fed. R. Civ. P. 8(a)(2), what the relevant loss "might be" and "what the causal connection might be between" the plaintiff's loss and defendants' misconduct.  *Id.*; *see also Wojtunik v. Kealy*, No. CV-03-2161-PHX-PGR, 2006 U.S. Dist. LEXIS 73448, at *11 (D. Ariz. Sept. 30, 2006).  Such an allegation can be as simple as the "share price fell significantly after the truth became known."  *Dura*, 544 U.S. at 347; *see also In re Omnivision Techs., Inc.*, No. C-04-2297 SC, 2005 U.S. Dist. LEXIS 16009, at *18-19 (N.D. Cal. July 29, 2005) (loss causation satisfied by allegations that "Plaintiffs purchased OmniVision securities at artificially inflated prices and suffered damages when revelation of the true facts caused a decline in the value of their investments").

Plaintiffs have not alleged merely that they paid artificially inflated prices for ARS.  (Mem. at 18.)  Rather, the Complaint alleges the following facts indicating they suffered losses as a result of the revelation of the undisclosed risks of investing in ARS:  (1) the ARS market depended on broker-dealers' pervasive interventions in the auctions; (2) a material risk existed that broker-dealers would withdraw their support for the ARS market, which would render Plaintiffs' and class members' ARS holdings illiquid and reduce the value of those holdings; (3) that risk was foreseeable to Defendants; and (4) the interest rates paid on ARS were inadequate to compensate investors for the risk of illiquidity or to attract new buyers, and were lower than the rates that the market would have placed on them had the investing public been aware of the true liquidity risks.  (¶¶ 141-55.)

The concealed risks materialized when all major broker-dealers withdrew their support and the market collapsed, leaving Plaintiffs and class members with illiquid securities they cannot sell at par, and on which they are receiving interest at below market rates.  Investors who sold their securities on the secondary market have realized substantial losses.  *See Special Situations Cayman Fund, L.P. v. Dot Com Entertainment. Group, Inc.*, No. 03-CV-0811E (F), 2003 U.S. Dist. LEXIS 25083, at *10 (W.D.N.Y. Dec. 5, 2003) ("[T]o the extent that plaintiffs' ultimate complaint about DCEG's pending de-

1    listing is *the illiquidity of its shares—and the consequent devaluation of plaintiffs' holdings*—plaintiffs

2    may seek money damages for any loss in value."); *Reshal Assocs., Inc. v. Long Grove Trading Co.*, 754

3    F. Supp. 1226, 1234 (N.D. Ill. 1990) (upholding loss causation allegations that plaintiffs suffered losses

4    on "speculative" and "illiquid" investments that defendants had misrepresented as "conservative" and

5    "liquid").  These allegations satisfy the Ninth Circuit's requirement that "the complaint must allege that

6    the practices the plaintiff contends are fraudulent were revealed to the market and caused the resulting

7    losses."  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008).

8            Defendants unsuccessfully attempt to resurrect their truth-on-the-market defense one more time,

9    arguing against loss causation on the ground that the whole truth about ARS was publicly revealed by

10   the SEC consent decree in May 2006, but that ARS did not fall substantially in value until February

11   2008.  (Mem. at 19.)  Defendants' argument is disingenuous.  The steep decline in the value of ARS

12   occurred when the entire market collapsed in February 2008.  Defendants knew, but failed to disclose,

13   that there was a risk of such collapse.  As already explained above, an accurate picture of the auctions—

14   that they had to be propped up by the concerted, behind-the-scenes efforts of all major broker-dealers,

15   lest the entire apparatus seize up—was *never* conveyed to the public, neither upon the entry of the SEC's

16   May 2006 consent decree nor at any other time before the market collapsed.  Thus, the "clock" by which

17   to evaluate loss causation did not start ticking until the market imploded.  When the market did so, ARS

18   promptly became illiquid and the true value of those became immediately apparent, showing a direct

19   causal connection between the risks that Defendants concealed and the losses Plaintiffs suffered when

20   those risks materialized.  Thus, loss causation appears on the face of the Complaint.

21   ## II.    PLAINTIFFS STATE CLAIMS UNDER SECTION 20(a).

22           The sole ground Defendants advance to dismiss Plaintiffs' claims against Wells Fargo & Co. and

23   the Bank as control persons under section 20(a) of the Exchange Act is that Plaintiffs have not stated

24   claims under section 10(b) against the controlled persons.  (Mem. at 20.)  As discussed above, however,

25   Plaintiffs have stated such claims.  Defendants' motion to dismiss should therefore also be denied.

26   ## CONCLUSION

27           For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion

28   to dismiss.  If the Court is inclined to grant Defendants' motion, however, Plaintiffs respectfully request

- 20 -

leave to amend their Complaint.

Dated: March 29, 2009                    Respectfully submitted,

                                         **GIRARD GIBBS LLP**

                                         By:   _/s/ Aaron M. Sheanin_

                                         Daniel C. Girard
                                         Jonathan K. Levine
                                         Aaron M. Sheanin
                                         Christina H. C. Sharp
                                         601 California Street, 14th Floor
                                         San Francisco, CA 94108
                                         Telephone:  (415) 981-4800
                                         Facsimile:  (415) 981-4846

                                         **Plaintiffs' Lead Counsel**

**CERTIFICATE OF SERVICE**

I, Aaron M. Sheanin, hereby certify that on May 29, 2009, I caused the foregoing document to be filed electronically with the United States District Court for the Northern District of California's through the Court's mandated ECF service.  Counsel of record are required by the Court to be registered e-filers, and as such are automatically e-served with a copy of the document(s) upon confirmation of e-filing.

I further certify that I caused this document to be forwarded to the following designated Internet site at: http://securities.stanford.edu/.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 29th day of May, 2009 at San Francisco, California.


        */s/ Aaron M. Sheanin*

CERTIFICATE OF SERVICE
CASE NUMBER: 08-cv-1962 (JSW)