1  Daniel C. Girard (State Bar No. 114826)
   dcg@girardgibbs.com
2  Jonathan K. Levine (State Bar No. 220289)
   jkl@girardgibbs.com
3  Aaron M. Sheanin (State Bar No. 214472)
   ams@girardgibbs.com
4  Christina H. C. Sharp (State Bar No. 245869)
   chc@girardgibbs.com
5  **GIRARD GIBBS LLP**
   601 California Street, Suite 1400
6  San Francisco, CA 94108
   Telephone: (415) 981-4800
7  Facsimile: (415) 981-4846

8  Plaintiffs' Lead Counsel

9

10                  **UNITED STATES DISTRICT COURT**

11            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

12  LINDELL VAN DYKE, AS TRUSTEE FOR      )
    THE VAN DYKE FAMILY TRUST, and        )   **CIVIL ACTION NO. 08-cv-1962 (JSW)**
13  SANDRA OLSEN, Individually And On Behalf )
14  of All Others Similarly Situated,      )
                                           )   **LEAD PLAINTIFFS' STATEMENT OF**
15            Plaintiff,                    )   **RECENT DECISION**
                                           )
16            v.                            )
                                           )   Date:    October 23, 2009
17  WELLS FARGO & CO., WELLS FARGO         )   Time:    9:00 a.m.
    INVESTMENTS, LLC, WELLS FARGO          )   Place:   Courtroom 11
18  INSTITUTIONAL SECURITIES, LLC, WELLS   )
    FARGO SERVICES, LLC, and WELLS         )   Honorable Jeffrey S. White
19  FARGO BANK, N.A.,                      )
20                                         )
              Defendants.                   )
21  _____)

22

23

24

25

26

27

28

1    Pursuant to Civil Local Rule 7-3(d), Lead Plaintiffs Lindell Van Dyke and Sandra Olsen

2    respectfully provide notice to the Court of a recent decision by the Honorable Lewis A. Kaplan of the

3    United States District Court for the Southern District of New York that is relevant to Defendants'

4    pending motion to dismiss, *Defer LP v. Raymond James Fin., Inc*., No. 08 Civ. 3449 (LAK), 2009 U.S.

5    Dist. LEXIS 84685 (S.D.N.Y. Sept. 17, 2009).  A true and correct copy of Judge Kaplan's decision is

6    provided herewith.

7

8    Dated: October 6, 2009                Respectfully submitted,

9

10                                         **GIRARD GIBBS LLP**

11                                         By:   */s/ Aaron M. Sheanin*

12                                         Daniel C. Girard
                                           Jonathan K. Levine
13                                         Aaron M. Sheanin
                                           Christina H. C. Sharp
14                                         601 California Street, 14th Floor
                                           San Francisco, CA 94108
15                                         Telephone:  (415) 981-4800
                                           Facsimile:  (415) 981-4846
16
                                           **Plaintiffs' Lead Counsel**
17

18

19

20

21

22

23

24

25

26

27

28

LEAD PLAINTIFFS' STATEMENT OF RECENT DECISION
CASE NUMBER: 08-cv-1962 (JSW)

## **CERTIFICATE OF SERVICE**

I, Aaron M. Sheanin, hereby certify that on October 6, 2009, I caused the foregoing document to be filed electronically with the United States District Court for the Northern District of California's through the Court's mandated ECF service.  Counsel of record are required by the Court to be registered e-filers, and as such are automatically e-served with a copy of the document(s) upon confirmation of e-filing.

I further certify that I caused this document to be forwarded to the following designated Internet site at: http://securities.stanford.edu/.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 6th day of October, 2009 at San Francisco, California.


*/s/ Aaron M. Sheanin*

CERTIFICATE OF SERVICE
CASE NUMBER: 08-cv-1962 (JSW)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
DEFER LP,

                    Plaintiff,

          -against-

RAYMOND JAMES FINANCIAL, INC., et al.,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

08 Civ. 3449 (LAK)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED #: 9/17/09

## MEMORANDUM OPINION

Appearances:

                Daniel C. Girard
                Jonathan K. Levine
                Aaron M. Sheanin
                Christina H. C. Sharp
                GIRARD GIBBS LLP
                *Attorneys for Plaintiff*

                Christian R. Bartholomew
                Jill Baisinger
                MORGAN, LEWIS & BOCKIUS LLP
                *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

        Plaintiff, an investor in auction rate securities ("ARS"), brings this purported class

action against a financial service firm and its two wholly-owned subsidiaries that underwrote,

marketed and sold the securities and managed the auctions at which the interest rates they paid were

set. Plaintiff claims that defendants knowingly misrepresented ARS to potential investors as highly liquid investments and earned millions of dollars in sales commissions and fees to their detriment. The matter is before the Court on defendants' motion to dismiss the complaint on the ground that it fails to state a legally sufficient claim. For the reasons set forth below, the motion is granted.

## Background

Auction rate securities are bonds or preferred stocks that pay interest or dividends at rates set at periodic auctions.[1] First introduced in 1984,[2] ARS experienced dramatic growth, and by February 2008 approximately $330 billion of ARS were outstanding.[3] The securities were attractive to issuers because they allowed them to obtain long-term capital at short-term rates.[4] ARS originally were marketed only to highly sophisticated institutional investors. Prior to the beginning of the class period, however, issuers and underwriters lowered the minimum required investment to $25,000, thus expanding the market for ARS to individuals, charities and small businesses.[5]

*Auction Rate Securities*

ARS pay interest or dividends at rates set at auctions that usually were held every 7,

---

[1]    First Amended Class Action Complaint (hereinafter "Cpt.") ¶¶ 3, 28.

[2]    *Id.* ¶ 30.

[3]    *Id.* ¶ 31.

[4]    *Id.* ¶ 29.

[5]    *Id.* ¶¶ 2, 33-34.

28, 35, or 49 days, with interest paid at the end of an auction period.[6]  In a typical auction, potential

buyers submitted bids for a specific quantity of securities with a particular interest or dividend rate.[7]

The rate bid at which the last securities were sold was the "clearing rate."[8]  This rate then applied

to all securities sold in the auction.[9]

Auctions could end in one of three ways: a successful auction, an "all-hold" auction,

or a failed auction.  In the first case, the demand for shares was equal to or greater than the supply.

All shares on the market were purchased, and the clearing rate applied to all securities sold until the

next auction.[10]  In an all-hold auction, investors decided to hold rather than sell their securities.  A

formula specified in the offering documents set the interest or dividend rate to be paid in this

scenario, which was usually lower than the market rate.[11]  An auction failed if the quantity of shares

or bonds offered for sale exceeded that bid for purchase, *i.e.*, when supply exceeded demand.  In that

situation, shareholders could sell their securities, and the "penalty rate" or "maximum rate" applied

until the next auction.[12]  The maximum rate on an ARS was intended to ensure the liquidity of the

security in the event of a failed auction by attracting new buyers.  This rate was specified also in the

---

[6]

    *Id.* ¶ 36.

[7]

    *Id.* ¶ 41.

[8]

    *Id.*

[9]

    *Id.*

[10]

    *Id.* ¶ 44.

[11]

    *Id.* ¶¶ 46-47.

[12]

    *Id.* ¶ 48.

offering documents.[13]

*Alleged Market Manipulation*

According to the complaint, between April 8, 2003 and February 13, 2008 (the "Class Period"), financial firms, including but not limited to defendants, underwrote billions of dollars of ARS that carried insufficient maximum rates to ensure the liquidity of those securities if auctions failed.[14] Broker-dealers then allegedly engaged in a variety of tactics to mask the risk of investing in ARS.[15]

These tactics included the routine intervention by broker-dealers in auctions by placing "support bids." Broker-dealers simulated demand by placing bids for their own accounts when auctions otherwise would have failed due to lack of investors.[16] Through extensive and sustained interventions of this type, numerous financial firms created the illusion that ARS were highly liquid, low-risk investments.[17] Without such interventions, there would have been widespread auction failures.[18]

As a result of insufficient investor participation in the market, broker-dealers who

---

[13]
    *Id.*

[14]
    *Id.* ¶ 51.

[15]
    *Id.* ¶ 52.

[16]
    *Id.* ¶ 53.

[17]
    *Id.* ¶¶ 56-57.

[18]
    *Id.* ¶ 58.

placed support bids were able to assert almost complete control over the interest and dividend rates paid on the ARS for which they managed auctions.[19]   Broker-dealers sometimes depressed the clearing rate to benefit issuer clients on whom they depended for business and underwriting and management fees.[20]   While they sometimes increased rates to entice investors, they decreased rates again once they had reduced their own inventories.[21]

As broker-dealers intervened to support auctions, they accumulated increasing numbers of securities in their own accounts.   They allegedly pressured their sales personnel to sell the ARS and thereby remove them from their own books.[22]   In addition, broker-dealers from certain firms other than defendants allowed some auctions to fail between August 2007 and early February 2008 rather than purchasing ARS.   These auction failures represented only a small fraction of the ARS market and were not widely known to investors.[23]   On February 13, 2008, however, all major ARS broker-dealers ended their support of auctions.   As a result, 87 percent of all ARS auctions failed.   The ARS market collapsed, and over $300 billion of the securities were rendered illiquid.[24]

---

[19]

*Id.* ¶ 61.

[20]

*Id.* ¶ 64.

[21]

*Id.* ¶ 65.

[22]

*Id.* ¶¶ 69-70.

[23]

*Id.* ¶ 71.

[24]

*Id.* ¶ 74.

*Raymond James Entities*

Defendant Raymond James Financial, Inc. ("RJF") is a financial firm that conducts brokerage and investment banking services through subsidiaries including defendants Raymond James & Associates, Inc. ("RJA") and Raymond James Financial Services, Inc. ("RJFS") (collectively "Raymond James" or "defendants"). RJFS sold auction rate securities to investors. RJA, a registered broker-dealer, underwrote auction rate securities and managed auctions for ARS that defendants sold to the investing public.[25] Raymond James earned substantial fees for these services.[26]

The complaint alleges that RJFS sold approximately $1.9 billion ARS to its clients during the Class Period. During that same period, RJA underwrote hundreds of millions of dollars of ARS. Defendants also managed auctions for several hundred million dollars worth of ARS.[27]

According to the complaint, Raymond James directed its financial advisors to represent to investors in written materials and uniform sales presentations that ARS were "equivalent to cash and were safe, highly liquid short-term investment vehicles suitable for any investor with at least $25,000 of available cash and as little as one week in which to invest."[28] Pursuant to these directives, Raymond James financial advisors sold ARS as cash equivalents and failed to disclose, *inter alia*, that (1) ARS were not cash alternatives, but actually long term financial

---

[25] *Id.* ¶¶ 12-14.

[26] *Id.* ¶¶131-37.

[27] *Id.* ¶¶ 78-80.

[28] *Id.* ¶ 89.

instruments with maturities of thirty years or more, (2) ARS lacked features designed to ensure the holder's ability to sell the security and that the purchaser would be required to hold the security indefinitely or until maturity in the event of an auction failure, (3) many ARS were subject to interest rate caps which, if triggered, would reset their interest rates to levels well below market rates, often as low as zero, and render the securities unmarketable, (4) broker-dealers were supporting the ARS market artificially to maintain the illusion of liquidity, (5) broker-dealers intervened in auctions routinely for their own benefit to set interest rates and often did so with knowledge of others' bids, and (6) in the event of persistent auction failures, securities would be saleable only at substantial discounts from purchase prices.[29]

The complaint alleges that defendants were aware that ARS were not equivalent to cash, that broker-dealers routinely intervened in auctions to maintain the appearance of stability and liquidity, and that interest or dividend rates were managed by broker-dealers with knowledge of other bids. According to the complaint, however, the individual financial advisors who marketed ARS to clients "lacked a rudimentary understanding" about the securities and how the ARS market functioned.[30]

Raymond James allegedly did not disclose the true nature of ARS or the risk of auction failure to investors through January 2007. Beginning in January 2007, however, defendants included in trade confirmations warnings that ARS were "subject to failed auction risk," that there was no assurance of success for any particular auction, and that there was no guarantee that the

---

[29]
     *Id.* ¶¶ 91-92.

[30]
     *Id.* ¶¶ 82, 90.

securities would trade at par in the absence of successful auctions.[31]

Following several auction failures in late August 2007, Raymond James published further disclosures on its ARS web page that warned also of the risk of failed auctions and stated that its broker-dealers might place bids for the firm's own account with knowledge of some or all other orders, encourage others to place bids likely to affect the clearing rate, and place bids to prevent a failed auction although it had no obligation to do so.[32]  Defendants, however, did not systematically alert investors who had purchased ARS from Raymond James previously to these newly disclosed risks. Moreover, defendants continued promoting ARS as short-term investments.[33]

Along with other broker-dealers, Raymond James withdrew its support of the ARS market in February 2008.[34] According to the complaint, Raymond James did so to avoid having to take additional unwanted securities onto its own balance sheet.[35]

*Plaintiff's Purchase of ARS*

Plaintiff Laurie Rubin learned about ARS through her Raymond James financial advisor, Richard Barnard, with whom she had a long professional relationship.  Mr. Barnard encouraged plaintiff to invest in ARS as an alternative to maintaining cash in a bank, as was her

---

[31]
    *Id.* ¶¶ 98-99.

[32]
    *Id.* ¶ 104.

[33]
    *Id.* ¶¶ 109-10.

[34]
    *Id.* ¶ 84.

[35]
    *Id.* ¶ 87.

practice. He explained to her that ARS were "safe, short-term investments, that they were similar to money market funds, that they were good cash management vehicles, and that they were better than keeping money in the bank."[36] Based exclusively on Mr. Barnard's advice, plaintiff purchased ARS during the Class Period.[37]

Throughout the class period, as more cash became available for investment, plaintiff consulted with Mr. Barnard about investment options. Over the course of numerous telephone conversations and occasional email messages, Mr. Barnard continued to recommend that she invest in ARS through the first week of February 2008, just one week before the auctions failed. Based on that advice, plaintiff authorized Mr. Barnard to purchase additional ARS on her behalf during the Class Period up to and including purchases in late January and early February 2008.[38] Neither Mr. Barnard nor any other Raymond James financial advisor provided plaintiff with a prospectus or other written materials describing the ARS she purchased.[39]

Plaintiff alleges that defendants' actions resulted in her holding illiquid ARS and decreased the income on her investment below what she otherwise would have received. She alleges that she remains unable to sell her securities and continues to receive below market rate interest on them. The value of her securities has declined substantially.[40]

---

[36]

    *Id.* ¶¶ 114-16.

[37]

    *Id.* ¶ 118.

[38]

    *Id.* ¶¶ 119-23.

[39]

    *Id.* ¶¶ 124-25.

[40]

    *Id.* ¶¶ 154-56.

*The Complaint*

Plaintiff brings this putative class action on behalf of herself and all persons and entities that purchased ARS from Raymond James during the class period.[41]  She alleges that defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act")[42] and SEC Rule 10b-5 thereunder[43] on the theory outlined above.   She alleges also that defendants RJF and RJA were "controlling persons" within the meaning of Section 20(a) of the Exchange Act[44] and therefore are vicariously liable for defendants' allegedly fraudulent acts.

*Discussion*

I.    *Standing*

As a threshold matter, defendants contend that plaintiff does not have standing to represent a class of all individuals who purchased any ARS from defendants, but may assert only claims relating to the specific securities that she purchased.[45]  Whether plaintiff can represent class members is not a question of standing, however.  The issue goes to the typicality of plaintiff's claims

---

[41]

     *Id.* ¶ 16.

[42]

     15 U.S.C. § 78j(b).

[43]

     17 C.F.R. § 240.10b-5 (2007).

[44]

     15 U.S.C. § 78g(a).

[45]

     Def. Mem. at 32.

as representative of those of other alleged Class members.[46] There is no dispute that plaintiff has standing to bring securities fraud claims arising out of her own purchase of ARS from defendants. The typicality question is addressed more properly on a motion for class certification.[47]

## II.    Standard Governing Motions to Dismiss

In deciding a motion to dismiss, a court ordinarily accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor.[48] In order to survive such a motion, however, "the plaintiff must provide the grounds upon which [her] is claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"[49] Although such motions are addressed to the face of the pleadings, the court may consider also documents attached to or incorporated by reference in the complaint.[50]

As this is a securities fraud case, the complaint must satisfy the heightened pleading

---

[46]

See FED. R. CIV. P. 23; *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp.2d 289, 334 (S.D.N.Y. 2003); *Open Hous. Ctr. v. Samson Mgmt. Corp.*, 152 F.R.D. 472, 476 (S.D.N.Y. 1993) ("[S]tanding to sue . . . is separate and distinct from the issue of whether the class representatives have claims that are typical of the proposed class members.").

[47]

*Presbyterian Church*, 244 F. Supp.2d at 334.

[48]

See *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001).

[49]

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (declining to limit *Bell Atl. Corp.* to antitrust cases).

[50]

See *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989)).

12

requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA")[51] – it must state the facts and circumstances constituting the alleged fraud with particularity.[52] Thus, it must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[53] Under the PSLRA, the complaint must also "state with particularity facts giving rise to a strong inference" of *scienter*.[54]

### III.   The 10b-5 Claims

The elements of a Section 10(b) – Rule 10b-5 claim are that the defendant "(1) made misstatements or omissions of material fact; (2) with *scienter*; (3) in connection with the purchase or sale of securities; (4) upon which plaintiff[] relied; and (5) that plaintiff['s] reliance was the proximate cause of [her] injury."[55]

Defendants argue that the complaint should be dismissed because it fails adequately to allege (1) an actionable misstatement or material omission, (2) that defendants acted with the requisite *scienter*, or (3) loss causation. They argue also that plaintiff's allegations of materiality

---

[51]

PUB. L. NO. 104-67, 109 Stat. 737 (1995).

[52]

FED. R. CIV. P. 9(b).

[53]

*Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (internal quotation marks omitted)).

[54]

15 U.S.C. § 78u-4(b)(2).

[55]

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998) (internal quotation marks omitted)).

and reliance are mutually exclusive.

### A.     Actionable Misstatement or Material Omission

The misstatements and omissions alleged in the complaint fall into two general categories: (1) misstatements and omissions regarding plaintiff's particular transactions, and (2) misstatements and omissions regarding the ARS market as a whole.  Defendants contend that the complaint should be dismissed because it fails adequately to allege an actionable misstatement or material omission in either category.  The Court will consider each in turn.

### 1.     Misstatements and Omissions Relating to Plaintiff's Transactions

The complaint alleges that plaintiff's financial advisor Mr. Barnard encouraged her to invest in ARS as an alternative to keeping cash in a bank, as had been plaintiff's usual practice.[56] In order to induce her to invest, Barnard allegedly told plaintiff that ARS were "safe, short-term investments, that they were similar to money market funds, that they were good cash management vehicles, and that they were better than keeping money in a bank."[57] Barnard allegedly repeated this advice to plaintiff throughout the Class Period by telephone and in email.[58] Defendants contend that these allegations are insufficient under the heightened pleading standards of Rule 9(b) and the

---

[56]

Cpt. ¶ 115.

[57]

*Id.* ¶ 116.

[58]

*Id.* ¶ 119.

PSLRA.[59]

Plaintiff has alleged the facts and circumstances of Mr. Barnard's statements with particularity. She identified the speaker and the statements. She specified additionally that Barnard made the statements repeatedly over the course of five years. Finally, she explained why the statements were false when they were made: rather than being a cash equivalent, the liquidity of the securities depended on the success of periodic auctions that were being supported only through purchases by other broker-dealers. If the auctions failed, ARS holders would have no market in which to sell the securities.[60] If Mr. Barnard were named as a defendant, then, these allegations would be sufficient.[61]

Mr. Barnard is not named as a defendant in the action. Although there is no requirement in a Rule 10b-5 case that the same individual who made an alleged misstatement on behalf of a corporation personally possess the requisite *scienter*,[62] "fraudulent statements must be

---

[59]

Def. Mem. at 13.

[60]

Cpt. ¶¶ 91-92.

[61]

*Pollack v. Laidlaw Holdings, Inc.*, No. 90 Civ. 5788 (DLC), 1995 WL 261518, at *9 (S.D.N.Y. May 3, 1995) (alleging "general time frame of communications," the identity of the speaker, and the content of the statements is sufficient, "especially where the communications occurred over a five year period"); *see also Novak*, 216 F.3d at 314 (primary purpose of Rule 9(b) is to provide defendant with fair notice of plaintiff's claim).

[62]

*In re Marsh v. McLennan Cos., Inc. Secur. Litig.*, 501 F. Supp.2d 452, 481 (S.D.N.Y. 2006); *see generally Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 193, 196 (2d Cir. 2008) (concluding that plaintiff may plead the requisite *scienter* against a corporate defendant without successfully pleading *scienter* against a specific individual at all).

linked directly to the party accused of the fraudulent intent."[63] The complaint therefore must link Barnard's allegedly fraudulent statements to one or more of the Raymond James entities. Attributing the statements to the defendants as a group is insufficient.[64]

      The complaint does not explicitly attribute Mr. Barnard's statements to any defendant. If supported by allegations in the complaint, however, the Court could attribute those statements to his employer, assuming he was acting within the scope of his employment when he allegedly made them. The complaint does not allege which defendant entity employed Barnard, but states only that Barnard was a "financial advisor located in Raymond James' Chicago office."[65] As the complaint uses the generic "Raymond James" to refer to all three defendant entities,[66] this is not particularly helpful. The complaint, however, does state that RJFS is the entity that marketed ARS to clients[67] and that Barnard sold ARS to plaintiff.[68] Taking the complaint as a whole then, the Court is obliged to infer that plaintiff alleges that Barnard worked for RJFS.

      As an employer is liable for the representations of its agent when those

---

[63]

    *In re Parmalat Secur. Litig.*, 479 F. Supp.2d 332, 340 (S.D.N.Y. 2007) (quoting *In re BISYS Sec. Litig.*, 397 F. Supp.2d 430, 438 (S.D.N.Y. 2005) (internal quotation marks omitted)).

[64]

    *380544 Canada, Inc. v. Aspen Technology, Inc.*, 544 F.Supp.2d 199, 218 (S.D.N.Y. 2008); *see also SEC v. U.S. Envt'l., Inc.*, 82 F. Supp.2d 237, 240 (S.D.N.Y. 2000) ("[P]laintiff must satisfy Rule 9(b) as to each individual defendant, and cannot do so by making vague allegations about the defendants as a unit.").

[65]

    Cpt. ¶ 114.

[66]

    *Id.* ¶ 15.

[67]

    *Id.* ¶ 14.

[68]

    *Id.* ¶¶ 121, 123.

representations are made within the scope of the agent's employment,[69] Mr. Barnard's statements may be attributed to RJFS if Barnard was acting as its agent when he made the statements. The complaint alleges that Raymond James "directed its financial advisors . . . to represent to investors in its written materials and uniform sales presentations that auction rate securities were equivalent to cash and were highly liquid short-term vehicles suitable for any investor."[70]  The complaint thus may be read to allege that Barnard made the misstatements to plaintiff at the direction of RJFS and within the scope of his employment.[71]

The complaint, however, fails to specify the remaining two defendant entities' participation in the fraud, at least with respect to Barnard's misstatements, and there is no allegation that Barnard was an agent of the other entities.

Plaintiffs rely on the group pleading doctrine as an exception to the rule requiring them to link the alleged misstatements directly to the party accused of the fraudulent intent. The group pleading doctrine, however, does not apply here.  That limited exception applies only to prospectuses, registration statements, annual reports, press releases, or other group-published information that may be presumed to be the collective work of corporate insiders "with direct

---

[69]
> See Glidepath Holding B.V. v. Spherion Corp., 590 F. Supp.2d 435, 453 (S.D.N.Y. 2007); see also Citibank, N.A. v. Nyland (CF8) Ltd., 878 F.2d 620, 624 (2d Cir.1989) ("[A] principal is liable to third parties for the acts of an agent operating within the scope of his real or apparent authority." ).

[70]
> Cpt. ¶ 89,

[71]
> Cosmos Import & Export Ltd. v. Merrill Lynch, Pierce Fenner & Smith, Inc., No. 96 CIV. 6224 (DLC), 1997 WL 328068, at *6 (S.D.N.Y. 1997) (complaint that stated a factual basis for attributing an agent's statements to his principal was sufficient to survive motion to dismiss).

involvement with the everyday business of the company."[72]  It does not apply to oral statements.[73] Nor does it apply to a financial advisor such as Barnard who is alleged only to have been involved in sales, not with running the everyday business of the company.

Moreover, even if the group pleading doctrine applied to the statements at issue, it would not link RJF and RJA, the corporate parent and underwriter, to the statements attributable to RJFS.[74] The defendants must be directly involved in the daily business of the company responsible for the statements for the exception to apply.[75]  Here there is no allegation that the parent or sister subsidiary was involved directly in designing the financial advisors' presentations, selling ARS, or otherwise running RJFS's business.[76]

---

[72]

In re Vivendi Universal, S.A. Secur. Litig., 381 F. Supp.2d 158, 191 (S.D.N.Y. 2003) (internal quotation omitted); see In re BISYS Secur. Litig., 397 F. Supp.2d at 438.

[73]

See Elliot Assocs. LP v. Covance, Inc., No. 00 Civ. 4115(SAS), 2000 WL 1752848, at *12 (S.D.N.Y. Nov. 28, 2000).

Although the complaint references "uniform sales presentations" and other written materials fraudulently describing the ARS, plaintiff does not allege that she received such materials from Barnard or anyone else, or even that she ever saw such materials. See Cpt.¶ 89; see also ¶¶ 112-30 (describing plaintiff's particular experience purchasing ARS from Raymond James). Nor is there any allegation that any other investor ever saw or received such written materials. See Cpt. ¶¶ 89-95.

[74]

See DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1248-49 (2d Cir. 1987) (allegations that defendants were, respectively, and affiliate and subsidiary of corporate entity that published an allegedly fraudulent offering memorandum insufficient to charge them with liability for misrepresentations in that document).

[75]

See In re Parmalat Secur. Litig., 479 F. Supp.2d 332, 340 (S.D.N.Y. 2007) (allegation that entity owned and controlled the subsidiary to whom statements were attributed was insufficient to justify application of the group pleading rule where there was no allegation that parent entity was involved directly in daily business of subsidiary).

[76]

Plaintiff argues that she alleges sufficiently that the three defendant entities "engaged in complementary actions," because in Count II, the complaint alleges that RJF and RJA had

2.    *Misstatements and Omissions Relating to the Alleged Scheme in General*

Plaintiff alleges also that Barnard's misstatements regarding the nature of ARS were part of a larger scheme by defendants to promote and sell ARS to the public.    According to the complaint, "Raymond James directed its financial advisors throughout the United States to represent to investors . . . that auction rate securities were equivalent to cash and were safe, highly liquid short-term investment vehicles."[77]  It alleges further that Raymond James financial advisors then sold ARS pursuant to management's directives.[78] In other words, plaintiff alleges that defendants instructed their representatives to make the same misstatements that she alleges Barnard made.  The complaint, however, fails to allege exactly who made the misstatements and to whom, when (other than throughout the Class Period), where, how frequently and in what form.  While the complaint alleges the content of the statement itself and why plaintiff believes it to have been fraudulent, the circumstances in which the statement allegedly was made are not identified sufficiently to meet the stringent standards of Rule 9(b).

The allegations fail also to link the allegedly fraudulent statements by the financial advisors to RJF and RJA for the same reasons discussed previously – there is no allegation that would support the attribution of the financial advisors' statements to those entities.  The statements, however, may be attributed  to RJFS because the complaint alleges sufficiently that the financial

---

"operational and management control" of RJFS's business. Cpt. ¶ 190; *see also id.* ¶¶ 188-92.  As these allegations are asserted only as to Count II, the Court does not consider them as to Count I, the Section 10(b) and Rule 10b-5 claim.  *See id.* ¶ 171 (repeating and reasserting "each and every allegation set forth in the paragraphs above" but not below).

[77]

Cpt. ¶ 89.

[78]

*Id.* ¶ 91.

advisors were agents of that entity.

The complaint alleges also that Raymond James made certain misstatements in trade confirmations issued after January 2007, over a year before the ARS market failed, and again on Raymond James' website after August 2007. According to the complaint, the trade confirmations stated:

> "Auction rate securities offer payments which reset at predetermined intervals at rates determined by Dutch auction. Dutch auction is a competitive bidding process by which securities are sold at the highest yield at which sufficient bids are received to sell all securities offered.

> "This security is subject to failed auction risk. There is no assurance that any particular auction will be successful. Neither the issuer, nor the broker-dealer, is obligated to take any action to ensure success. In the absence of successful auctions, there is no assurance that a secondary market will develop or that the security will trade at par."[79]

The website provided similar disclosures warning of the risk of a failed auction "when there are more sellers than buyers," and stating that although such a situation is "not a frequent occurrence" it "is still a possibility."[80] It stated additionally that

> "[A]s part of its regular course of business, Raymond James may routinely:

> "(a)    place one or more Orders in Auctions generally for its own account, even after obtaining knowledge of some or all of the other Orders, and it may do so in any particular auction;

> "(b)    place Bids on the firm's behalf or those of others, and may encourage others to place Bids likely to affect the Clearing Rate (including preventing the Clearing Rate from becoming the Maximum Rate) and the allocation of securities being auctioned . . . .

> "In addition, under exceptional circumstances Raymond James may:

---

[79]

    Cpt. ¶ 99.

[80]

    *Id.* ¶ 104.

"(a)    place one or more bids in auctions generally to prevent a Failed Auction or a Clearing rate the Broker-Dealer believes is not a market rate at the time it makes its Bid, even after obtaining knowledge of some or all of the other Orders, but is not obligated to continue to place such Bids or to bid in any particular Auction;

"(b)    encourage bidding by others in Auctions generally to prevent a Failed Auction or a Clearing Rate it believes is not a market Rate, even after obtaining knowledge of some or all of the other Orders, and it may do so in any particular Auction."[81]

Defendants contend that the trade confirmation and website disclosures provided precisely the information the complaint alleges that the plaintiff lacked. Plaintiff disputes this, arguing that the statements failed to disclose (1) the extent to which broker-dealers were required to intervene in the auctions in order to sustain the market,[82] and (2) that interest rates were not determined by a Dutch auction but were managed by broker-dealers.[83] But this dispute is beside the point for the present purpose. What is material is plaintiff's allegation that these disclosures should have been, but were not, provided at the beginning of the Class Period and that they contradicted the alleged statements of the financial advisors then selling the ARS. Moreover, when Raymond James did make these disclosures, they were not provided to investors who had purchased ARS prior to their publication.[84] In other words, the relevance of the document and website is not whether they contained misstatements, but the manner in which they highlight defendants' alleged omission of this information throughout the preceding period.

---

[81]    *Id.*

[82]    Pl. Mem. at 16.

[83]    Cpt. ¶ 103.

[84]    *Id.* ¶¶ 106-07.

But again, the complaint does not specify which defendant allegedly is responsible for the alleged omissions.[85]  The omissions of which plaintiff complains are those that plaintiff argues should have been provided to investors by the financial advisors.  They thus are attributable to RJFS.  But the complaint fails to allege how the remaining two defendant entities are responsible for these omissions.  The alleged omissions thus are insufficiently particularized as to RJA and RJF.  Furthermore, even if the Court were to parse the trade confirmation for a misstatement, it is clear from its face that it was published by RJFS,[86] so it would not assist the plaintiff in attributing a misstatement to an additional defendant.  Nor would the website, which provides no clue as to the identity of its authoring entity.[87]  The complaint thus fails to attribute any alleged misstatement or omission to defendants RJF and RJA.

*B.*     Scienter

A plaintiff alleging a Rule 10b-5 claim must "state with particularity facts giving rise to a strong inference that [each] defendant acted with the required state of mind."[88]  To satisfy this requirement, a complaint must (1) demonstrate "that [each] defendant[] had both motive and opportunity to commit fraud," or (2) allege "facts that constitute strong circumstantial evidence of

---

[85]
See *DiVittorio*, 822 F.2d at 1247 (requiring complaint to set forth the specific nature of each defendant's participation in the alleged fraud); *Cyber Media Group, Inc. v. Island Mortgage Network, Inc.*, 183 F. Supp.2d 559 (E.D.N.Y. 2002).

[86]
Pl. Ex. 6; *see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (on a motion to dismiss, the court may consider documents attached to the complaint as exhibits).

[87]
See Pl. Ex. 11.

[88]
15 U.S.C. § 78u-4(b)(2).

conscious misbehavior or recklessness."[89]  A complaint gives rise to a strong inference of *scienter* "only if a reasonable person would deem the inference of *scienter* cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[90]  Moreover, conclusory allegations are insufficient to establish *scienter*.  "[A] pleading technique [that] couple[s] a factual statement with a conclusory allegation of fraudulent intent is insufficient to support the inference that the defendants acted recklessly or with fraudulent intent."[91]

Although the complaint must be dismissed as to RJF and RJA for the reasons discussed above, the Court nevertheless considers the sufficiency of plaintiff's allegations of *scienter* as to each of the defendants and concludes that the lack of such allegations requires dismissal of the complaint as a whole.  The insufficiency of the *scienter* allegations provides also an independent ground for dismissal as to RJF and RJA.

*1.    The Complaint Does Not Provide Particularized Allegations of* Scienter

Plaintiff fails to allege facts that particularize how and why *each* defendant actually knew, or was reckless in not knowing, that the alleged statements and omissions were fraudulent at the time they were made.[92]  This is insufficient.

---

[89]
  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000) (citing *Shields*, 25 F.3d at 1128).

[90]
  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

[91]
  *Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004) (internal quotation marks and citation omitted).

[92]
  *In re BISYS Secur. Litig.*, 397 F. Supp.2d at 440 n.44 (requiring particularized *scienter* as to each defendant and listing cases).

Plaintiff contends that pleading individualized allegations of *scienter* is unnecessary because the complaint alleges the "interconnectedness" of defendants' conduct.[93]  She relies upon *In re Marsh & McLennan*.[94]  But her reliance is misplaced.

In *Marsh & McLennan*, the court concluded that the plaintiff had plead sufficiently the *scienter* of a parent corporation for a subsidiary's issuance of misleading statements when the complaint included allegations that "demonstrate[d] the parent company's familiarity with the subsidiary's operations and, ultimately, its misconduct."[95]  The allegations thus supported a finding that the parent was aware of or recklessly disregarded the subsidiary's intentional misconduct.  Here, in contrast, the complaint fails to allege any facts that would support a conclusion that RJF or RJA were aware of RJFS's alleged misstatements or that otherwise would demonstrate the nature and extent of the relationship among the defendant entities, apart from the fact that RJFS and RJA are subsidiaries of RJF.[96]

The lack of particularized allegations of *scienter* are fatal to plaintiff's claims against RJF and RJA.  The Court nonetheless will consider plaintiff's allegations of *scienter* as to all three defendants.

---

[93]  Pl. Mem. at 24.

[94]  501 F. Supp.2d at 483.

[95]  *Id.* at 483.

[96]  The only support plaintiff provides for her argument that she has alleged the "interconnectedness" of defendants is a reference to "[d]efendants' letter to its ARS clients on January 2, 2009." Pl. Mem. at 24.  Plaintiff, however, does not cite to where in the complaint or attached exhibits the Court may find the letter and, having undertaken its own review of the submitted documents, the Court can find no reference to it.

2. *Motive and Opportunity*

Plaintiff alleges that defendants collectively had both the motive and opportunity to commit the alleged fraud. The complaint states that defendants' motive was to "perpetuate the artificial ARS market" so that they could earn substantial sales commissions and fees for underwriting the securities and managing ARS auctions.[97] An allegation that defendants' motive was merely to increase or maintain profit such as this is insufficient. This Circuit has repeatedly held that similar allegations of a generalized motive that could be imputed to any for-profit endeavor therefore are not sufficiently concrete for purposes of inferring *scienter*.[98] Rather, plaintiff must allege that defendants benefitted in some concrete and personal way from the purported fraud.[99]

Plaintiff comes closer to alleging that defendants benefitted in a concrete way when she suggests that defendants' motive was to unload their excess and soon to be illiquid ARS inventory on unsuspecting customers. But plaintiff faces the added difficulty that in order to infer that any one defendant had such a motive, the Court must assume a shared knowledge of the entire scheme among a plurality of defendants. This is because the scheme assumes knowledge of both parts of Raymond James' ARS business – the marketing and sales performed by RJFS and the underwriting and management function performed by RJA. But the complaint fails to allege that RJFS had any knowledge of what occurred at its sister subsidiary, including whether its broker-dealers were supporting auctions or whether it even had an access inventory of ARS. Likewise,

---

[97]

     *See* Pl. Mem. at 20; Cpt. ¶¶ 4, 89, 132.

[98]

     *See, e.g., Novak*, 216 F.3d at 307; *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996); *Fort Worth Employers' Retirement Fund v. Biovail Corp.*, 615 F. Supp.2d 218, 226 (S.D.N.Y. 2009).

[99]

     *Novak*, 216 F.3d at 307-08.

there is no allegation that RJA was aware of what went on at RJFS, including the manner in which financial advisors marketed the securities to clients. For any defendant entity to have had a motive to unload the excess ARS by defrauding customers, each had to know something of the others' business. There is no allegation in the complaint, however, from which the Court can infer that the Raymond James entities had even the most basic understanding of the others' business.

To be sure, there is authority at least suggesting that a plaintiff may establish corporate *scienter* by relying on the collective knowledge of its employees.[100] But here, plaintiff asks the Court to go one step further and aggregate the knowledge of two or more separate corporate entities on the basis that they share the same parent and nothing more. This the Court will not do. There are good reasons for imputing the collective knowledge of employees or agents to their corporate principal. Doing so creates incentives for the entity to create and maintain effective internal communications and, more importantly, serves to protect third parties with which it does business. But there is no similar rule requiring the imputation of a subsidiary's knowledge to its parent, at least where there are no allegations as to the existence of an agency relationship or other foundation on which to premise the parent's vicarious liability.[101] Nor should there be. An employee acting within the scope of his or her employment is an agent of his or her employer. The

---

[100]
> See *In re World Com, Inc. Secur. Litig.*, 352 F. Supp.2d 472, 497 (S.D.N.Y. 2005); *see also Caterpillar, Inc. v. Great Am. Ins. Co.*, 62 F.3d 955, 962 (7th Cir. 1995) (contemplating a case where *scienter* established through collective knowledge of corporate employer); *United States v. Bank of New England, N.A.*, 821 F.2d 844, 855-56 (1st Cir. 1987) (aggregating knowledge of corporation's employees to support knowledge element in finding defendant corporation criminally liable) (cited by *World Com*).

[101]
> See *Marsh & McLennan*, 501 F. Supp.2d at 482 (imputing *scienter* of subsidiary to parent when factual allegations established that parent was familiar with subsidiary's operations and misconduct).

same cannot be said of a subsidiary *vis-à-vis* its parent, at least not necessarily.[102]  There

relationships vary considerably and do not yield to a simple rule of agency.  As the knowledge of

the defendant entities cannot be aggregated on the basis of the allegations contained in the

complaint, the Court concludes that the complaint fails to allege that any defendant had a motive to

defraud the ARS purchasers.

### 3.     *Conscious Misbehavior or Recklessness*

To raise a strong inference of *scienter* based on conscious misbehavior or

recklessness, a plaintiff must allege conduct that is "highly unreasonable and which represents an

extreme departure from the standards of ordinary care."[103]  In some circumstances, allegations that

defendants had "knowledge of facts or access to information contradicting their public statements"

may be sufficient to show recklessness.[104]  Where, as here, however, a complaint fails adequately to

allege motive, "the strength of circumstantial allegations of conscious misbehavior or recklessness

'must be correspondingly greater.'"[105]

Plaintiff fails to allege facts sufficient to demonstrate conscious misbehavior or

recklessness.  Plaintiff contends that the representations of the RJFS financial advisors that ARS

---

[102]

  *See, e.g., Bollinger*, 485 U.S. at 347 (reasoning that the mere fact of a parent's control over
  wholly-owned subsidiaries did not establish the existence of an agency relationship).

[103]

  *Novak*, 216 F.3d at 308 (internal quotation marks and citations omitted); *see also South
  Cherry Street, LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009).

[104]

  *Novak*, 216 F.3d at 308.

[105]

  *In re Bayer AG Sec. Litig.*, No. 03-2004-CV, 2004 WL 2190357, at *43 (S.D.N.Y. Sept. 30,
  2004) (quoting *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987)).

were safe, liquid instruments constitute a particularized allegation of recklessness because "Raymond James served as an underwriter for hundreds of millions of dollars of ARS issues" and underwriters occupy a unique position that enables them to discover certain information of consequence to investors and thus have "'a concomitant duty to investigate and confirm the accuracy of . . . fund materials they distribute.'"[106] But this argument reveals the same fatal flaw discussed earlier. The Court cannot infer that RJFS was aware it was marketing ARS to potential investors fraudulently because there is no showing that RJFS or its insiders had access to the underwriters' "unique" knowledge of the ARS market. Indeed, the complaint itself states that RJFS's agents, the financial advisors who allegedly made the misrepresentations to investors, "lacked a rudimentary understanding about auction rate securities and how the auction rate securities market functioned during the Class Period."[107]

Plaintiff argues also that the size of defendants' participation in the ARS market provides circumstantial evidence of *scienter*. While plaintiffs are correct that "the magnitude of the alleged fraud" does provide some circumstantial evidence of *scienter*,[108] alleging a large fraud on its own does not carry plaintiff's burden to allege *scienter* with particularity. Nor is the magnitude of the fraud especially impressive here. Although defendants allegedly sold $1.9 billion in ARS to investors, there was $330 billion in ARS outstanding by the close of the class period.[109]

---

[106]

Pl. Mem. at 21 (quoting *SEC v. Tambone*, 550 F.3d 106, 133 (1st Cir. 2008)).

[107]

Cpt. ¶ 95.

[108]

Pl. Mem. at 22 (quoting *Katx v. Image Innovations Holdings, Inc.*, 542 F. Supp.2d 269, 273 (S.D.N.Y. 2008)).

[109]

Cpt. ¶¶ 31, 78.

*C.*     *Remaining Arguments*

As the Court concludes that the complaint does not adequately allege that defendants made an actionable misstatement or material omission with *scienter*, the Court need not consider whether the complaint adequately alleges loss causation nor address any of defendants' remaining arguments.

## Conclusion

For the foregoing reasons, defendants' motion to dismiss the First Amended Class Action Complaint [docket item 36] is granted. Nevertheless, it is far from clear that plaintiff cannot state a legally sufficient claim against some or all of the defendants. Accordingly, plaintiff is granted leave to amend on or before October 16, 2009.

SO ORDERED.

Dated:        September 17, 2009

_____
Lewis A. Kaplan
United States District Judge